A. T. Matthews v. Commissioner.
Matthews v. Commissioner
Docket No. 53947.
United States Tax Court
T.C. Memo 1955-330; 1955 Tax Ct. Memo LEXIS 7; 14 T.C.M. (CCH) 1294; T.C.M. (RIA) 55330; December 22, 1955
*7 Held, on the facts, that petitioner disposed of a note by sale rather than in a compromise settlement. Deduction of the loss realized on the sale of such note is limited by the provisions of section 117 of the 1939 Code. Howard L. Robinson, Esq., Union Bank Building, Clarksburg, W. Va., for the petitioner. James F. Shea, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax of the petitioner *8 for the years 1948, 1949, and 1950 in the amounts of $6,727.02, $1,995.72, and $18,622.54, respectively. The parties have entered into stipulations settling all the issues raised by the pleadings for the years 1948 and 1949, and all but one of such issues for the year 1950. The sole issue remaining is whether respondent correctly determined that petitioner is limited to a capital loss deduction of $1,000 for the year 1950 with respect to a $31,500 loss sustained by him during that year. Some of the facts were stipulated. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. Petitioner resided in Clarksburg, West Virginia, during the years 1948, 1949, and 1950. He filed his returns for such years on the cash basis, with the collector of internal revenue for the district of West Virginia. During the period 1939 to May 1947, petitioner bought and sold a number of parcels of real estate and made an occasional loan. Four of the loans which he made during these years, aggregating approximately $75,000, were purchase-money loans made to various individuals who had purchased real estate from him. Two loans, in the amounts of $10,000 *9 and $62,500, respectively, were made to the Anchor Fixture Company and petitioner also discounted a note of between $6,000-$7,000 which was owed the Anchor Fixture Company by one of its customers. Another loan made by petitioner was to the Nitro Land Company, a corporation in which he owned approximately 43 per cent of the outstanding stock. In May 1947, petitioner acquired 75 per cent of the stock of the Stonewall Jackson Hotel and a like amount of the stock of the corporation which held title to the real estate of the hotel, namely, the Stonewall Building Company. He loaned $5,000 to one John S. Dump, Jr., to enable that individual to acquire the remaining 25 per cent of the stock of these two corporations. Petitioner then lent substantial sums to the two hotel corporations. From May 1947 to the date of the hearing herein, petitioner's occupation was that of president and manager of the Stonewall Jackson Hotel. Petitioner did not make any loans after 1947, except on his "own property." The $62,500 loan to the Anchor Fixture Company (hereinafter referred to as Anchor) was made in the following manner: Early in 1947, F. G. Hart, president of Anchor, suggested that the corporation *10 acquire a loan from petitioner for the purpose of retiring 250 shares of its capital stock in order that Hart would have complete control of the corporation, and dissensions between major stockholders would thus come to an end. F. G. Hart owned, at that time, 248 of the 500 shares of the corporation's outstanding common stock. Petitioner and his attorney, Dale G. Casto, each owned one share and the remaining 250 shares were owned by E. A. Haddad and members of his family. On February 4, 1947, petitioner loaned Anchor the sum of $62,500, receiving a negotiable promissory note in that amount from the corporation. Interest was payable on such note at the rate of six per cent per annum. Anchor used the proceeds of petitioner's loan to purchase 250 shares of its outstanding stock from E. A. Haddad and infant members of E. A. Haddad's family, in accordance with the plan suggested by the corporation's president. These shares could not be reissued without the written consent of petitioner. F. G. Hart guaranteed the repayment of the loan to petitioner by pledging his 248 shares of stock as collateral. By October 16, 1950, Anchor's financial condition had deteriorated to the point where *11 it could no longer meet the payment of its bills in the regular course of business and it was in default in the payment of its promissory note to petitioner. The E. A. Haddad Company was interested in obtaining operating control of Anchor and, on October 16, 1950, it made the following offer to Anchor: "Mr. F. G. Hart, President Anchor Fixture Company "I have examined for E. A. Haddad Company the financial circumstances of this corporation and, in my opinion, it is hopelessly insolvent unless some new money is obtained by it and provision made for the payment of the indebtedness of this corporation. "E. A. Haddad Company can purchase the A. T. Matthews note, executed by this corporation, bearing date the 4th day of February, 1947, originally in the sum of $62,500.00 with credits due thereon, and now in the sum of $54,000.00, for the sum of $25,000.00. E. A. Haddad Company is willing to purchase this note and advance the said $25,000.00 if this corporation will, upon my delivery of said note to it, issue to E. A. Haddad Company 250 shares of the capital stock of this corporation. "The corporation has an authorized capital stock of $50,000.00 and 250 shares of such stock have *12 been issued and are now outstanding and there are 250 shares now held by the Treasury as Treasury Stock. "In addition to the purchase of this note, E. A. Haddad Company will loan to the corporation the sum of $15,000.00 in order to enable this company to continue to operate and will take therefor a note of said corporation, payable at such time as may be agreed upon. "You will please advise if you are interested in accepting this proposal. Yours very truly, /s/ E. A. Haddad President." The offer of the E. A. Haddad Company was accepted by the shareholders of Anchor on October 16, 1950, and the following resolution of acceptance was adopted: "BE IT RESOLVED by the owners and holders of all the outstanding stock of this corporation, that the written proposal of E. A. Haddad, as president of E. A. Haddad Company, wherein the said E. A. Haddad Company would purchase from A. T. Matthews a certain promissory note bearing date the 4th day of February, 1947, originally in the sum of $62,500.00, for the sum of $25,000.00 and endorse, transfer and deliver said note to this corporation for 250 shares of its capital stock, be and the same is hereby accepted." On that same day, the *13 E. A. Haddad Company paid to Dale G. Casto, attorney for petitioner, the sum of $25,000, and Casto delivered to the E. A. Haddad Company the Anchor note, which had been previously endorsed by petitioner. The Haddad Company transferred the note to Anchor and 250 shares of Treasury stock of Anchor were issued to the Haddad Company on October 16, 1950. The petitioner and his attorney, Dale G. Casto, each transferred their one share of Anchor stock to members of the Haddad family on that same day. Petitioner held the Anchor note from February 4, 1947 to October 16, 1950, a period of over three years. Petitioner claimed a deduction on his return for 1950 for the loss which he had sustained on the disposition of the Anchor note. Respondent determined that petitioner had "sustained a long-term capital loss of $31,500.00 on account of the sale of said note, $1,000.00 of which is an allowable deduction for the year 1950. In the alternative, said loss of $31,500.00 is a non-business bad debt, $1,000 of which is an allowable deduction." Opinion RICE, Judge: During the period 1939 to 1950, inclusive, petitioner made a number of loans to various individuals and corporations. Four of these *14 loans were purchasemoney loans arising out of the sale of parcels of real estate by petitioner; several loans were made to three corporations in which he had a substantial proprietary interest; and the remaining four loans do not lend themselves to ready classification. We are here concerned with a loan in this last group of four; namely, one in the amount of $62,500, which was made in 1947. We must decide whether petitioner is entitled to deduct, in full, a $31,500 loss which he sustained in 1950 upon the disposition of the note evidencing this loan or whether he is limited to a $1,000 capital loss deduction as determined by respondent. Petitioner contends that he was regularly engaged in the business of lending money to individuals and business enterprises and that the $31,500 loss sustained on the disposition of the Anchor note is deductible in full as a business loss under section 23(e)(1) of the 1939 Code. [1] We need not decide, however, whether petitioner was engaged in the business of making loans. For even assuming that he was, and assuming that the instant loan of $62,500 was made in the course of such business, we think the record clearly demonstrates that the note evidencing *15 such loan was sold rather than extinguished by means of a compromise settlement and, accordingly, petitioner's loss deduction is limited by the provisions of section 117 of the 1939 Code. [2] It has been firmly established that, under section 117(a)(1), accounts and notes receivable are capital assets unless held by a person engaged in selling the same in the ordinary course of his trade or business. (C.A. 5, 1945); ; ; , affd. (C.A. 2, 1942), certiorari denied ; , affd. (C.A. 6, 1942). Section 23(g)(1) provides that "Losses from sales or exchanges of capital assets shall be allowed only to the extent provided in section 117" and, therefore, even though the instant note may have been acquired in the regular course of petitioner's business, the loss realized on its sale is a capital loss, deductible only to the extent provided *16 by section 117(d). ; ; *17 Petitioner argues that the Anchor note was liquidated by a compromise settlement rather than by sale or exchange and that, accordingly, the limitation imposed by sections 23(g)(1) and 117 upon the deductibility of his loss is inapplicable. Petitioner refers to the statement in Regulations 111, Section 29.23(e)-1, that "Substance and not mere form will govern in determining deductible losses," but we are convinced that the substance of the instant transaction was, in fact and effect, a sale. Anchor, the maker of the note, did not have the available cash to effect a compromise of its indebtedness to petitioner had it desired to do so. The E. A. Haddad Company was desirous of obtaining some 250 shares of Anchor Treasury stock and revitalizing that corporation. However, the stock could not be issued without petitioner's consent under the terms of the loan he had made to Anchor. The E. A. Haddad Company, therefore, purchased the note from petitioner for $25,000 and then transferred it to Anchor in return for 250 shares of its capital stock. At the same time, it also supplied Anchor with some $15,000 as working capital. Careful study of this transaction compels the conclusion that petitioner *18 elected to sell the Anchor note to the E. A. Haddad Company rather than exercise his legal rights as a creditor. Although Anchor appears to have been insolvent at the time of this transaction, it is entirely possible that petitioner might have been eventually able to secure an equal or even larger amount directly from Anchor than from the sale of the note to the E. A. Haddad Company. But, having chosen to pursue the latter course, he must accept the tax consequences. Additional evidence that this transaction was a sale rather than a compromise of indebtedness is the fact that the minutes of the October 16, 1950, meeting of Anchor stockholders refer to the transaction as a sale. The part played by the obligor of the note, Anchor, in the negotiations between petitioner and the E. A. Haddad Company, does not remove the transaction from the category of a sale to that of a compromise of indebtedness. See (C.A. 3, 1945), affirming a Memorandum Opinion of this Court, entered April 28, 1943 [; ; . The transaction, as it *19 was consummated, had real economic significance. Petitioner sold his note to the E. A. Haddad Company and the purchaser, in turn, exchanged this note with Anchor, the obligor, for 250 shares of its Treasury stock. The record does not show that the E. A. Haddad Company purchased these 250 shares of Treasury stock for $15,000 cash and then permitted Anchor to retire the note itself, by way of compromise. As conceived and executed by the parties, there were two independent transactions - first, the sale of the note, and then the exchange of the note for Treasury stock. Having disposed of the note in this manner, petitioner's loss deduction on this transaction must be limited by the provisions of section 117. Petitioner has cited (C.A. 2, 1939); (D.C.Mass., 1943); and . These cases involve compromise of indebtedness situations and are distinguishable on their facts. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - (1) if incurred in trade or business; * * * ↩
2. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *
(d) Limitation on Capital Losses. - * * *
(2) Other taxpayers. - In the case of a taxpayer, other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus the net income of the taxpayer of [or] $1,000, whichever is smaller. * * *↩